**LEALAIFUANEVA PETER E. REID and
AFOA MOEGA LUTU, Petitioners,**

**v.**

**SOLIAI TUIPINE, Chief Election Officer, Respondent.**

High Court of American Samoa
Appellate Division

AP No. 15-00

December 1, 2000

Before KRUSE, Chief Justice, RICHMOND, Associate Justice, WARD,[*] Acting Associate Justice, LOGOAI, Associate Judge, and ATUILAGI, Associate Judge.

Counsel: For Plaintiffs, Marshall Ashley
 For Defendant, Elvis R.P. Patea

## OPINION AND ORDER

Per Curiam:

Petitioners Lealaifuaneva Peter E. Reid ("Reid") and Afoa Moega Lutu, candidates for governor and lieutenant governor, seek to contest the results of the gubernatorial election held on Tuesday, November 7, 2000 ("Election Day") pursuant to A.S.C.A. §§ 6.0902 and 6.0903. Petitioners filed their complaint on November 14, 2000, at 2:55 p.m., alleging eight causes of action for invalidating the November 7, 2000, election. Respondent Soliai Tuipine, Chief Election Officer, filed his answer on November 17, 2000. The Court took evidence[1] and heard arguments on November 20, 22, and 24, 2000.

---

[*] Honorable John L. Ward, II, Judge, District Court of American Samoa, serving by designation of the Secretary of the Interior.

[1] A.S.C.A. § 6.0903(a) refers election contests to the Appellate Division of the High Court, which received evidence in its role as fact-finder.

## Facts

In 1996, Respondent adopted administrative rule No. EL-01-96 ("Election Rules") for carrying out Title 6 of the American Samoa Code ("Election Laws"). A.S.A.C. § 3.1101 of the Election Rules sets forth the voting procedures for requesting and casting temporary and local absentee ballots.[2]

Respondent made the Election Rules available for public inspection and, on August 15, 1996, filed certified copies with the Secretary of American Samoa (Lieutenant Governor), the Secretary of the Senate, and the Clerk of the House of Representatives. (Ex. 25.). The Election Rules became effective on September 4, 1996, and were duly applied in the 1996, 1998, and 2000 elections. These rules have remained uncontested until the current case before the Court.

Respondent published a description of the Election Rules that was made available to candidates and the general public before each election ("Candidate Manual"). The Candidate Manual for the election at issue was published in the latter part of June 2000. (2000 Candidate Manual Ex. 31.) Respondent also mailed an additional set of papers to all candidates on August 25, 2000, detailing the Election Office's absentee voting procedures. (Absentee Voting Booklet Ex. 2.)

Respondent was summoned by the Senate and appeared on September 8, 2000, to discuss the absentee ballot procedure. Petitioner Reid, as a Senator, also attended this hearing, but neither he nor the Senate made any complaints or official challenges in the form of a letter or resolution, or otherwise contested the absentee voting procedure as provided for by A.S.C.A. § 4.1009(d). At a later date, emissaries from Petitioners' campaign committee visited Respondent and discussed the absentee voting procedure.

---

[2] A.S.C.A. § 6.1101(c) distinguishes between three categories of absentee ballots and applies different procedures for each. Off-island absentee ballots are received from electors away from American Samoa because of U.S. or A.S.G. government employment, active military service, or study abroad ("off-island"). A.S.C.A. § 6.0903(c)(1). Temporary absentee ballots are received from electors absent from the territory for reasons due to medical treatment, military-related assignments, employment, or vacation ("temporary"). A.S.C.A. § 6.0903(c)(2). Local absentee ballots are those received from voters present in the territory on Election Day, but unable to make it to the polls because of confinement in a hospital, public institution, or home; a religious belief; or employment as an election official ("local"). A.S.C.A. § 6.1101(c)(3).

For the 2000 general election, Respondent designated one or more polling stations in each of the 17 election districts in accordance with A.S.C.A. § 6.0502(a). Respondent added one polling station, the Amouli/Auasi/Utumea polling station on Tutuila, to the 43 polling stations designated in the 1996 general election, totaling 44 polling stations territory-wide. This addition was made available for the benefit of voters residing in Aunu'u who complained about not being able to return to the polling station on the island in time to vote.

Respondent hired and designated election officials to perform the functions of the Election Office under A.S.C.A. § 6.0102(h). Prospective election officials completed applications requiring that applicants reveal, in addition to other personal information, whether they are active members of "any campaign for public office," and whether they are an "immediate relative of anyone who is campaigning for public office." (Ex. 28.) Respondent states that he did not hire applicants who answered in the affirmative to either of these two questions.

No district officials were suggested by any of the three district governors for the general election of 2000. The district governors did not submit a list of names to Respondent as defined in A.S.C.A. § 6.0102(e) and allowed by A.S.C.A. § 6.0402(a), nor did Respondent solicit such a list. District officials are required to perform Election Day functions including: deciding challenges to the qualifications of electors on Election Day, A.S.C.A. § 6.0223(b); opening the polls, A.S.C.A. § 6.0701; providing sufficient polling booths, A.S.C.A. § 6.0703(a); placing and observing the ballot boxes, A.S.C.A. § 6.0703(b); opening and exposing empty ballot boxes to all present before the start of voting, A.S.C.A. § 6.0705(a); sealing the ballot box and forwarding it to a central polling station, A.S.C.A. § 6.0802(a); and performing a number of other statutorily-mandated functions. Respondent instead designated one election official to be a "team leader" of each polling station to perform most of the functions required of district officials. He did not screen these individuals for the ability to speak Samoan and English as is required by A.S.C.A. § 6.0402(a) for district officials. Nor did he require any of the team leaders, or other election officials, to rule on challenges to elector qualifications as also required of district officials. Rather, he instructed election officials to set the challenged votes aside in envelopes to be ruled upon by the Board of Registration.

Respondent kept a running list of election officials as he hired them, including those election officials designated as team leaders. Until Election Day, individuals resigned or might have been removed from the list due to admitted or discovered affiliation with partisan campaigns. A final list of election officials was not compiled until Election Day. Respondent did not receive any requests to view this list of election officials, nor he did he make the list public out of fear that the officials

13

would be susceptible to bribery.

On or about September 1, 2000, Respondent caused 15,600 ballots for the governor's race to be printed, corresponding to the actual number of registered voters. Respondent received requests for ballots from off-island absentee voters until October 24, 2000, fifteen days before the general election, pursuant to A.S.C.A. § 6.1102. Respondent responded to these with either a denial letter or a packet containing an official ballot, instructions and a reply envelope, all within 24 hours of receiving the request in accordance with A.S.C.A. § 6.1103.

Completed off-island absentee ballots arrived at the U.S. Post Office of American Samoa at least biweekly until Election Day. Respondent's staff picked up the ballots at the post office and delivered them to the main Election Office in Utulei ("Election Office"). On the days following the biweekly flights, poll watchers for all candidates were invited to observe the opening of the absentee ballot container and the disposition of the off-island absentee ballots. With poll watchers in attendance, Respondent removed the absentee ballot container from Respondent's file cabinet, both of which, box and cabinet, were locked and accessible by Respondent's sole key. Election officials then checked the envelopes for qualifications and tampering, called out the registration numbers before logging them in the election log, and placed the envelopes in the ballot box. At the close of each session, Respondent re-locked the absentee ballot container in his file cabinet. Respondent similarly placed the off-island absentee ballots arriving during the week in the file cabinet until the upcoming Monday or Friday public sessions.

Respondent required that temporary and certain local absentee ballots be cast at the Election Office, which functioned as the "absentee qualified elector polling station" under A.S.C.A. § 6.1107. These voters were instructed to show proper identification to Respondent's employees, who then checked the voters' personal files for proper qualification. If deemed qualified, each voter received three ballots which the voter cast and placed in envelopes. The voters sealed the envelopes, signed their names and voter registration numbers on the seal, and placed the envelopes in the respective box for Governor, House of Representatives, or Congressional delegate.

Respondent did not accept requests for temporary absentee ballots between the 75th day prior to the election and the printing of the ballots on or about September 1, 2000. After the printing of the ballots, Respondent implemented A.S.A.C. § 3.1101 in refusing to mail absentee ballots to temporary absentee voters who had already left the island. Respondent did not disqualify these voters from voting on-island, in person, if they so chose to vote.

14

Only those local absentee voters who qualified because of an inability to attend the polls were allowed to cast their vote from somewhere other than the polling stations in the territory. In those instances, election officials visited the elector at that elector's location to procure his or her vote.

Notwithstanding Respondent's review of election officials, certain election officials had partisan interests. We find at least one case of overt coercion by election officials who attempted to influence the vote of a local absentee voter.[3] In addition, at some of the polling stations, campaigners wearing T-shirts with candidate logos were allowed to mill about polling stations, sit in the election officials' chairs in the polling stations, greet voters entering the stations, and supply food to various election officials.

On the eve of the general election, Petitioners challenged the qualifications of 35 electors under A.S.C.A. § 6.0223(a) by way of a letter to Respondent delivered at approximately 2:45 p.m. (Ex. 19.) Respondent, preoccupied with the practicalities of staging the election, did not fully investigate the challenges, did not post notice to the challenged voters, and did not make a final decision on or respond to the letter until after the election. Respondent mailed a letter to Petitioners dated November 13, 2000, explaining that, though he made no decision regarding the challenge of 35 voters brought in mid-afternoon the day before the opening of the polls, Petitioners had been freely capable of challenging the qualifications of these voters at the polls themselves. (Ex. 26.) None of the 35 voters were challenged by Petitioners' poll watchers on Election Day.

At approximately 8:00 p.m. on November 6, 2000, the night before Election Day, poll watchers were called to the election office to observe the opening of the absentee ballot containers and the sorting of the ballots. At 8:35 p.m., Petitioners' poll watcher arrived. Under Respondent's supervision, election officials removed the gubernatorial absentee ballot box from the file cabinet and placed it on a table in the middle of a large room in the election office, within an area accessible only to election officials and fenced off from the general public. The officials unlocked the box and removed the individual ballot envelopes. Utilizing the voter identification number and name written on each envelope, about ten election officials sorted the envelopes into 44 piles

---

[3] Specifically, a group of election officials went to collect the vote of an elderly woman in Ta'u who was confined to bed, and effectively instructed her who to vote for. Her daughter reported this activity to Petitioners' campaign committee, who reported it to Respondent on Election Day. Respondent voided that ballot, and dispatched election officials to the voter's home to collect another vote.

15

representing the 44 polling stations. The election officials called out each voter's registration number and name to provide poll watchers the opportunity to cross-check their separate voter lists and challenge the qualifications of individual voters. Then, the officials secured the piles of ballot envelopes into large manila envelopes and placed these on the floor immediately before the Respondent and his counsel, who were both seated at Respondent's desk.

While sorting the gubernatorial ballots, the election officials noticed that a number of congressional ballots had been mistakenly placed in the gubernatorial ballot box. They reasoned that absentee voters had improperly switched their ballots for Governor and Delegate to the U.S. House of Representatives, and that the congressional ballot box probably contained gubernatorial ballots. Respondent ordered the election officials to open and search the congressional absentee ballot box for gubernatorial votes that were found therein. The officials continued sorting gubernatorial ballots until sometime between 2:00 to 3:00 a.m., during which time the large manila envelopes containing the gubernatorial absentee ballots remained open on the floor in front of Respondent. No challenges were raised, either throughout the night or at the close of sorting, regarding voter qualifications or the sorting process.

At approximately 4:00 a.m., only the gubernatorial and congressional ballots had been sorted. In order to meet the poll opening deadline of 6:00 a.m., election officials placed the large manila envelopes into the corresponding ballot boxes for each polling station, except for the Manu`a and Aunu`u island ballot boxes that had been delivered the day before. They then closed and secured the boxes with padlocks. Respondent dispatched the individual polling officials to their respective polling stations, each carrying a locked ballot box filled with office supplies and the absentee ballots in manila envelopes. The officials were each accompanied to their assigned destinations by police escorts.

Meanwhile, election officials at the Election Office continued to sort the absentee ballot box for the American Samoa House of Representatives. On the morning of Election Day, more absentee ballots arrived in the mail. These were collected, verified, and sorted by election officials. Sometime before noon, three election officials accompanied by a police officer began to deliver these absentee ballots to the individual polling stations.

All the polling officials arrived at their designated polling stations before 6:00 a.m. to set up their materials. At each station, the polling officials removed the large manila envelopes containing the absentee ballots from the ballot boxes and set them aside. They then displayed the empty ballot boxes to all present, including poll watchers for all candidates. Beginning at 6:00 a.m., voters proceeded to cast their ballots. They: 1)

16

presented identification; 2) had their name and voter registration number called out; 3) signed the poll log; 4) picked up three blank ballot forms to mark their gubernatorial, congressional, and representative votes; 5) entered a screened area to cast their vote; and 6) placed each marked ballot into the respective gubernatorial, congressional, and representative ballot box, located in the middle of the room.

Leone election officials did not require qualified electors to sign the poll book prior to receiving and casting their ballots. Instead, they highlighted the names of voters in the poll book with a yellow marker until the team leader noticed and corrected this error. On the poll accounting report submitted to the Election Office after the polls had closed, the team leader noted in parentheses the number of names highlighted separately from the number of voters' signatures counted.

Respondent instructed team leaders to allow persons lawfully present at the polls on Election Day the opportunity to challenge the qualifications of any individual voters, in accordance with A.S.C.A. § 6.0223(b). In some instances, team leaders openly and repeatedly discouraged poll watchers from challenging voter qualifications, although ultimately, the evidence shows that all challenges were taken into account. All qualified voters were allowed to vote at the polls, but if challenged, this vote was sealed and set aside for later determination by the Board of Registration. Approximately 22 challenged votes were set aside and not counted in the election result. These are now pending determination by the Board of Registration.

Respondent allowed all polling stations located on Manu'a to close early so that the election officials could depart Manu'a for Tutuila on the afternoon flight from Ta'u around 12:30 p.m. One Ta'u polling station closed at 11:10. Between 11:10 and 11:30 the team leader instructed the village mayors (*Pulenu'u*) to scour the villages to determine that all qualified electors had voted. The district governor of Manu'a then certified that all persons had voted. Respondent then authorized the early counting of the votes in the Manu'a islands. Early release of the results was not authorized, but neither was it prohibited. The polling station located on Tutuila for Manu'a residents remained open until about 6:00 p.m., the closing time prescribed for all polls.

After each station closed, team leaders opened the large manila envelopes holding the governor's absentee ballots, removed the envelopes containing individual absentee ballots, and transferred the ballots within each to the governor's ballot box. At the Leone polling station, one of Petitioners' poll watchers attempted to challenge this procedure, but he subsequently retracted this challenge after consulting with Petitioners' Leone campaign committee. Officials then unlocked and opened the governor's ballot box. Without first counting the total

17

number of votes cast to determine that this amount corresponded with the number of electors shown on the poll book, as required by A.S.C.A. § 6.0802(a), the votes for each candidate were tallied. Only after the votes were counted as such did election officials compare the total number of ballots against the number of electors who voted, as indicated by the voters' signatures, stamps representing absentee ballots, and proxy votes in the poll book. The election officials reported these figures in poll accounting reports for each polling station.

Election officials tallied a total of 12,057 votes territory-wide, not including the 22 challenged ballots that were placed aside at the polls. Petitioners received 342 votes less than the leading candidate, who received 82 votes more than the majority of votes required by A.S.C.A. § 4.0104 to avoid a run-off and carry an election.

Fourteen polling stations reported discrepancies between ballots counted and votes cast as reflected by the poll book. Each discrepancy was described as an "underage" or "overage" in accordance with A.S.C.A. § 6.0803(a). An overage occurs when there are more ballots than the poll book reveals were cast; an underage occurs when there are fewer. The poll accounting reports for the 14 polling stations show the following: Faleasao, underage of 14 (Ex. 5); Tula/Onenoa, underage of 3 (Ex. 6); Utulei/Gataivai, underage of 4 (Ex. 7); Fagatogo, underage of 4 (Ex. 8); Aunu'u/Amouli, underage of 1 (Ex. 9); Amouli/Auasi/Utumea, overage of 22 (Ex. 9); Pago Pago, underage of 5 (Ex. 11); Nu'uuli, overage of 90 (Ex. 12); Leone, overage of 255 (Ex. 13); the Tutuila polling station for Manu'a, underage of 2 (Ex. 14); Amaluia/Asili/Afao/Atauloma, underage of 5 (Ex. 15); Vaitogi, underage of 2 (Ex. 16); Vailoatai, overage of 26 (Ex. 17); and Futiga/Maleloa Ituau, underage of 1 (Ex. 18). The total number of initially reported overages and underages is 438.

Following Election Day, a veteran Election Office official of the 1994, 1996, 1998 and 2000 elections ("Reviewer") attempted to reconcile the 2000 election results by counting the signatures of voters who voted on each roll, the stamped absentees whose votes were counted on the rolls, and the proxies on the rolls. These she totaled and compared with the poll accounting reports submitted by the election officials of each polling station. Reviewer reported her results for each polling station. (Ex. 34-42.) On the morning of November 14, 2000, the result was posted in summary form for public viewing at the Election Office. (Ex. 29.) The following table, complied by the Court, compares the overages ("+") and underages ("-") of the initial report against the reconciled report, and lists the reasons given by the Reviewer for the disparate numbers.

18

| Polling Station | Initial Report | Reviewer's Report | Explanation by Reviewer |
|---|---|---|---|
| Faleasao Manu'a | -14 | +1 | Absentee ballots not counted (+16), Local absentee votes not counted (-2), Spoiled ballot (-1) |
| Tula/Onenoa | -3 | +1 | Absentee ballot not counted (+1), Challenged ballots not counted (+4) |
| Utulei/Gataivai | -4 | +1 | Absentee ballot not counted (+3), Challenged ballots not counted (+2), |
| Fagatogo | -4 | +1 | Absentee ballots not counted (+2), Void ballots not counted (+3) |
| Aunu'u/Amouli | -1 | -1 | |
| Amouli/Auasi/ Utumea | +22 | +24[4] | Void ballot not counted (+1), Challenged ballot not counted (+1) |
| Pago Pago | -9 | 0 | Void ballots not counted (+2), Challenged ballots not counted (+3) Bad math in summing ballots (+4) |
| Nu'uuli | +90 | +1 | Miscounted signatures (+9), Absentee ballots counted (-109), Void ballots not counted (+5), Challenged ballots not counted (+6) |
| Leone | +255 | -2 | Counting signatures and highlights (-263),[5] Absentee ballot not counted (+1) |

---

[4] Reviewer explains that this overage represents the ballots cast and counted at Aunu'u/Amouli, that were again counted at Amouli/Auasi/Utumea.

[5] The Leone poll accounting report cites 483 signatures and 247 highlighted names, totaling 730. The Reviewer counted 746 signatures and highlights total. The 16-vote difference is not explained in the evidence presented.

| Polling Station | Initial Report | Reviewer's Report | Explanation by Reviewer |
|---|---|---|---|
| | | | **Votes not reconciled (+5)** |
| Tutuila (for Manu'a) | -2 | +1 | Absentee ballots not counted (+2), Challenged ballot not counted (+1) |
| Amaluia/Asili/ Afao/Atauloma | -5 | -1 | Challenged votes not counted (+4) |
| Vaitogi | -2 | 0 | Miscounted signatures in poll book (+1) · Absentee ballots not counted (+1) |
| Vailoatai | +26 | -2 | Miscounted signatures in poll book (+1), Absentee ballots not counted (-34), Challenged ballots not counted (+5) |
| Futiga/Malaeloa Ituau | -1 | 0 | Absentee ballot not counted (+1) |
| **Total** | **+/- 438** | **+/- 36** | |

The Reviewer's reconciliation shows a total of 36 underages and overages, which figure is significantly less than the initial report of 438 overages and underages. This discrepancy is attributed by Reviewer to the election officials' mistake in Leone of highlighting names, absentee ballots either counted or not counted at the 14 polling stations, and void ballots. The Reviewer failed to reconcile 5 votes in Leone.

Further, Reviewer has shown that of the 36 overages and underages, 23 votes are due to the mistaken double-counting and double-reporting of Aunu`u/Amouli ballots, consisting of 10 votes for Petitioners and 13 votes for the leading candidates. This double-counting has two effects: first, it reduces the number of acknowledged overages and underages to 13 (36 total overages or underages minus the 23 Aunu`u/Amouli votes), and second, if taken into account in the election results ("revised results"), it reduces the margin by which leading candidates hold the majority vote to 81 votes.[6]

---

[6] If the election result is corrected to reflect the 23 double-counted votes (where Petitioners received 10 votes and the leading candidates 13), the total number of voters becomes 12,034, the 50% majority becomes 6017, and hence the margin to majority is reduced by only one vote, to 81.

The number of uncertain votes in the 2000 election figure does not equal or exceed 81, the number by which the leading candidate carried the majority vote. Considering the evidence in the light most favorable to Petitioners, the Court finds that the number of uncertain votes includes: (1) the 22 votes that were challenged, set aside at the polling stations, and not included in the final election tally, (2) 13 overages and underages, and (3) the 5 unreconciled votes in Leone. Adding the 22 challenged votes into the revised results as if they voted for Petitioners reduces the leading candidate's majority margin to 70.[7] No combination of the remaining uncertain votes equals or exceeds this number.

## Discussion

Petitioner sets forth eight causes of action: 1) disenfranchisement of temporary absentee voters; 2) unauthorized change to the register of electors; 3) improper security for absentee ballots; 4) overage of voters in Leone; 5) improper early closing of polls in Manu'a; 6) failure to provide a list of election officials; 7) unaddressed challenges to improper or unqualified electors; and 8) wrongful acts and election fraud generally.

## Standard of Review

■ A.S.C.A. § 6.0903(c) sets the standard of review for invalidating a general election.[8] Petitioners must prove that the election result has been made uncertain due to (1) mistake or (2) fraud or (3) the indeterminacy of the leading candidates' majority margin according to the valid votes cast. *See Mau v. Fuimaono*, 27 A.S.R. 2d 44, 47 (App. Div. 1994) (finding a candidate's fraud to have sufficiently invalidated three votes cast, rendering the result uncertain); *Fuala`au v. Setu*, 23 A.S.R.2d 48, 50 (App. Div. 1992) (holding that the standard for determining that an election result is uncertain under A.S.C.A. § 6.0903 depends on the number of valid votes cast). The Court in *Fuala`au* interpreted A.S.C.A. § 6.0903(c) to mean that the election is to be invalidated only if the

---

[7] If the challenged votes are added to the total votes cast, taking into account the Aunu'u/Amouli double-counting, the total votes cast numbers 12,056. Even assuming that all 22 excluded votes were cast for Petitioners, again taking into account the double-counting, then the leading candidates' total would be 6098, and the margin to the 50% majority of 6028 would be 70.

[8] A.S.C.A. § 6.0903(c) states: "[A] judgment may invalidate the general election on the grounds that a correct result cannot be ascertained because of a mistake or fraud on the part of the district or election officials; or because it cannot be determined that a certain candidate, or certain candidates, received a majority or plurality of votes cast and were elected.

number of ineligible ballots cast is equal to or greater than the winning margin. *Id.* (quoting *Dole v. Attorney General*, AP No. 24-78, slip op. at 8 (App. Div. 1978)).

Moreover, Petitioners have the burden of proving the uncertainty of the election result by clear and convincing evidence. *Wilks v. Mouton*, 722 P.2d 187, 190 (Cal. 1986); *see also Donohue v. Bd. of Elections*, 435 F. Supp. 957, 967 (E.D.N.Y. 1976) (placing a heavy burden upon plaintiffs to show necessity for a new presidential election).

## I. Disenfranchisement of Temporary Absentee Voters

Petitioners contest the effect of the Election Rules as applied to absentee voting during the 2000 election. Petitioners claim that the rules run counter to Election Laws, and that Respondent's use of these rules excluded a number of voters who, if allowed to vote, may have rendered the election result uncertain.

The laws of American Samoa guarantee the vote of temporary absentee voters by enabling them to request votes until the day before the election, and by providing that they be mailed ballots within twenty-four hours of their request. The three categories of absentee voters—off-island, temporary, and local—are governed by the same statutory process for voting under A.S.C.A. § 6.1103, though subject to different timelines for submitting requests under A.S.C.A. § 6.1102. At issue are the Election Rules as they are applied to temporary absentee voters.

A.S.C.A. § 6.1101(c)(2) mandates temporary absentee voters "shall be allowed to vote." A.S.C.A. § 6.1102(b) provides for such voters to request ballots any time after the 75th day before the election, up until 4:30 p.m. the day before the election. A.S.C.A. § 6.1103 then mandates that the Chief Election Officer "shall examine the records" for the voter's qualifications, and "shall mail in a forwarding envelope, via airmail if necessary, or deliver in person . . . an official ballot." For those requests made on the last day of receipt, the provision mandates that these be mailed "as soon as reasonably practicable, but in no event later than 24 hours after its receipt." *Id.* This statutory language reflects the legislative intent, manifested in certain procedures, for ensuring the vote of temporary absentee voters.

Respondent's interpretation of this statutory mandate has been made explicit through the Election Rules, the Candidate Manuals, the Absentee Voting Booklet, and his conduct in the 1996, 1998 and 2000 elections. Specifically, A.S.A.C. § 3.1101(a) of the Election Rules restricts temporary absentee voting to the "availability of ballots printed." The Candidate Manual elucidates that temporary absentee voters "must vote at the Election Office before he/she travels, provided that official ballots

are printed and available [sic]." (2000 Candidate Manual Ex. 31 at 26.) The Absentee Voting Booklet also explains the policy, in reference to local absentee ballots under A.S.C.A. § 6.1102(b):

> [I]f an elector travels before the official ballots are printed, he does not qualify to vote by absentee ballot, and the Election Office is not authorized to send him absentee ballots to his off-island address.

(Absentee Voting Booklet Ex. 2 § 2.1.1.) Respondent's procedure restricts temporary absentee voters in two distinct ways not contemplated by the Legislature: they may not request votes before ballots are printed, and they may only vote in person. Temporary absentee voters must vote in the narrow window of time between the printing of the ballots and their departure from the island, or else not vote at all. Thus, Petitioner argues, those who request to vote and leave before the printing of the ballots are discriminated against in a way not contemplated by our Election Laws.

■ We agree with Petitioners. The Election Rules as applied to on-island residents who travel due to medical, business, military, or vacation reasons are inconsistent with the Election Laws. Administrative rules simply cannot supersede existing statutory authority where they directly conflict, as in this case. Considerable deference is given to administrative decisions involving an agency's construction of its governing statute and regulations, but only if the court decides that the interpretation is consistent with the statutory mandate and does not frustrate legislative policy. *Nat'l Pac. Ins. Co. v. Comm'r, Am. Samoa Gov't's Workmen's Comp. Comm'n*, 22 A.S.R.2d 15, 17 (Trial Div. 1992); *United States v. Rutherford*, 44. U.S. 543, 552 (1979); *see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). However, whether we have jurisdiction to decide this issue in this election contest is a threshold matter that precludes us from directly ruling on Petitioners' first count. With this in mind, we now address Respondent's motion to dismiss this first of Petitioners' claims based on either lack of standing or lack of jurisdiction due to improper venue for contesting an administrative rule. We consider these grounds for dismissal as follows.

## A. Petitioners' Standing to Contest Election Rules

■ We find that Petitioners have standing to bring this claim pursuant to A.S.C.A. § 6.0902, which states that with respect to any election, "any candidate . . . may file a complaint in the High Court." The provision further states that the complaint "shall set forth any cause or causes . . . that could cause a difference in the election result." Petitioners are candidates for governor and lieutenant governor of American Samoa.

23

Further, Petitioners' complaint alleges that up to 300 voters may have been wrongly disenfranchised due to Respondent's adherence to the Election Rules. In an election where Petitioners' opposition holds the majority margin by 82 votes, the alleged exclusion of up to 300 voters could very well "cause a difference in the election result." As candidates challenging a critical number of votes, the Petitioners have standing to assert this claim.

## B. Lack of Subject Matter Jurisdiction Under the Election Statutes

Although we find that Petitioners have standing to bring this election contest before the Court, Respondent contends that this Court is not the proper venue for hearing Petitioners' first count.

■ Under A.S.C.A. § 3.0208(c), the Appellate Court has jurisdiction to hear matters "specifically provided for by statute." Title 6 of the American Samoa Code explicitly provides that election contests be heard by the Appellate Division of the High Court. *See* A.S.C.A. § 6.0903(a). We look again to A.S.C.A. § 6.0902, entitled "Contests for Cause," for guidance as to what specific subject matter the Court is authorized by law to review in such election contests. The first sentence of the second paragraph of A.S.C.A. § 6.0902 intimates that the Court may hear virtually any cause of action. It states:

> The complaint shall set forth any cause or causes, including but not limited to: provable fraud, overages, or underages, that could cause a difference in the election result.

The next sentence, however, constrains the basis on which the Court may rule by directing that:

> The complaint shall also set forth any reasons for reversing, correcting, or changing the decisions of the district or election officials.

*Id.* Reading the two sentences together, we find that this Court has broad powers to review "any cause . . . that could cause a difference in the election result," but only insofar as the cause is treatable by "reversing, correcting, or changing the decisions of district or election officials." *Id.* The statute thus limits this Court to adjudicating the decisions of election officials that could cause a difference in the election result.

■ This case does not qualify under the subject matter jurisdiction provided for by A.S.C.A. § 6.0902. Respondent is the election official responsible for drafting and adopting the Election Rules, which decisions allegedly made a difference in the election result. However, Petitioners challenge the legality of Election Rules themselves. These rules

24

arguably involve more than Respondent's decision-making, but include also the measure of public sanction given by the open hearings held on said rules, their uncontested application in the 1996 and 1998 elections, and Petitioners' own knowledge of these rules and lack of challenge to them prior to and during the election. We find that the enactment of an administrative rule involves more than the mere "decision" of an election official for purposes of the statutes concerning election contests. We rule, therefore, that the review of administrative rules is outside the scope of our review.

We note that Petitioners had more than ample time to contest the Election Rules as applied not only to the 2000, but also the 1996 elections in which Petitioners took part. Such delay may estop parties from obtaining post-election relief from challenges to rules that could have been heard and remedied prior to the election itself. We agree with the Fifth Circuit Court of Appeals, in that prompt pre-election action may be a prerequisite to post-election relief. *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973). Otherwise, judicial policy "may permit, if not encourage, parties who could raise a claim 'to lay by and gamble upon receiving a favorable decision of the electorate' and then, upon losing, seek to undo the ballot results in a court action." *Id.* (quoting *Toney v. White*, 476 F.2d 203, 209 (5th Cir. 1973)).

■ Even if this Court had jurisdiction to review the first count, we are unable to invalidate the election based on this claim. Petitioners' first claim is that the election result is uncertain because it should have included the votes of wrongly-excluded temporary absentee voters. However, statutory law only allows this Court to void elections based on the uncertainty of valid votes cast—not on votes that might have been cast. *Fuala`au*, 23 A.S.R.2d, at 50.

We find that Respondent's rules regarding temporary absentee voters are at odds with statutory law, and strongly urge the parties, the Legislature, the Governor, and those temporary absentee voters affected by the rules to take appropriate action to correct this administrative restriction upon statutory voting rights. A.S.C.A. § 4.1006 provides that "[e]ach agency shall afford any interested person the opportunity to petition for the issuance, amendment, or repeal of a rule." A.S.C.A. § 4.1009(d) provides that "The Legislature may by letter or resolution make appropriate suggestions for changes, amendments, repeals, or additions to the rules."

## II. Unauthorized Change to Register of Electors

In their second claim, Petitioners complain that the nebulous class of temporary absentee voters who were not allowed to vote in the 2000 elections, and who did not vote in the 1998 election, are required by law

to be purged from the register of voters by Respondent. Respondent has entered two motions to dismiss this second cause of action, which we grant for lack of standing.

■ A.S.C.A. § 6.0902 establishes the standards for standing in election contests. Specifically, the second paragraph of this provision establishes two requirements for Petitioners' complaint: first, that it "shall set forth any cause or causes . . . that could cause a difference in the election result," and second, that it "shall set forth any reasons for reversing, correcting, or changing the decisions of the district or election officials." A.S.C.A. § 6.0902. In other words, all causes of action brought before this Court in an election contest must claim to make a difference in the election result, and must pertain to a decision of a district or election official.

Petitioner's second count, which challenges the legal requirement to purge voters from the voter registry, has no effect on the numerical result of Election Day. They do not, therefore, have standing to bring this second claim.

The Court is not insensitive to the apparent unfairness of the possibility that certain unidentified voters who were not allowed to vote under the Election Rules and who for some reason did not vote in 1998 might soon be stricken from the register of electors for no fault of their own. Such voters, however, have individual legal recourse against Respondent, and are not barred from re-registering to vote in the next election.

## III. Improper Security for Absentee Ballots

Petitioners challenge the security measures taken by Respondent in handling absentee ballots, and pray for the Court to declare them, and the election in which they were cast, void. We find that a number of irregularities and deviations from the statutory guidelines did occur. However, without any evidence of tampering or fraud that might render the election result uncertain, we cannot grant Petitioners' prayer.

A. Security of Absentee Ballot Containers

Respondent, his officials and employees engaged in practices that contravene the security measures prescribed by the statutory scheme for protecting absentee ballots. A.S.C.A. § 6.1106(a) requires that "[e]ach absentee ballot shall be placed in an absentee ballot container or containers." The provision further defines the ballot box as a securely-sealed container with only an opening for inserting ballots, which must be secured in Respondent's office. *Id.* The Election Rules and Absentee Voting Booklet are consistent with this law, in mandating that the ballots

26

shall remain sealed and secured in an absentee ballot box. The box is to remain locked, and Respondent is to hold the sole key.

Out of mere convenience, Respondent adopted a practice of locking in his file cabinet, but not in the designated ballot box, off-island absentee ballots that arrived in the mail on days other than those following the biweekly flights. There they remained until the next public session for deposit. Additionally, on the eve of the election, in order to meet a self-imposed morning deadline, Respondent opened the ballot box and sorted the absentee ballot return envelopes into large manila envelopes. These envelopes sat, open and on the floor, for about six hours in the Election Office, though secure behind a barrier and under guard of Respondent himself, for about six hours. Further, absentee ballots arriving on the morning of Election Day were picked up and carried by hand by three election officials to the 44 different polling stations under police escort. In these ways, the Respondent did not maintain the absentee ballots in their designated secure container as mandated by the Election Rules or Election Laws. In the absence of any additional evidence, however, we find that these lapses made the ballots less secure, but not insecure enough to establish a compelling legal or factual basis for invalidating an election.

## B. Disposition of Absentee Ballots

■ We find, further, that Respondent's administrative rules and adherence thereto contravene statutory law. A.S.C.A. § 6.1106(b) strictly prohibits the opening of the absentee ballot container before Election Day. Once officials open the ballot box to begin the vote tally, A.S.C.A. § 6.1108(c) provides that "the envelope [containing the absentee ballot] may be opened and the ballot counted as prescribed by law for the voting system in use." *See also* A.S.C.A. § 6.1108(a). However, Absentee Voting Booklet § 3.2 allows the absentee ballot box to be opened at Respondent's direction and in his presence. (Ex. 2.) The administrative rules thus give discretion to Respondent where the statute does not so provide.

Respondent supervised the opening of the absentee ballot boxes on the eve of Election Day in order to sort them into piles for delivery to the various polling stations. This action contravenes the statute, although it is authorized by the Election Rules. It introduces possibilities for suspicion and uncertainty that strict adherence to the statutory guidelines would obviate. However, there being no evidence that such actions had any affect on the election result, we cannot void the absentee ballots.

27

## C. Count of Absentee Ballots on Election Day

■ Respondent ordered that the absentee ballots be counted within the districts, except for on the islands of Aunu`u and Manu`a, on Election Day. Such a policy required employees and officials of the Election Office to sort the ballots into manila envelopes on the eve of the election, to deliver these in less-than-secure conditions to the polling stations, and to securely maintain the envelopes until the end of voting, on the evening of Election Day. As demonstrated above, these practical consequences of Respondent's decision to have absentee ballots counted at satellite stations violate a number of statutory prescriptions, and jeopardized the security of the ballots.

A.S.C.A. § 6.0802 governs the counting of ballots in the territory's election process. Primarily, it requires that Respondent designate "a central polling station" to count all ballots, which we take literally to mean one polling station centrally located. A.S.C.A. § 6.0802. Respondent, however, adopted rules requiring the counting of ballots to take place at a "designated polling station within the district of the qualified elector," where absentee ballots were "[to] be counted with the ballots that were cast at the polling station." A.S.A.C. § 3.1102. This standard of delivering and counting the ballots away from a central polling station was further sanctioned by Respondent's documented procedures.

The Election Laws require that all ballots be counted at a central polling station. The Election Rules require that they be counted at each of the several polling stations. Respondent's promulgation and adherence to the Election Rules resulted in a number of snags requiring side-stepping the explicit statutory prescriptions for the counting of ballots. Respondent's actions of convenience clearly deviate from the cautious procedures prescribed by law. Yet again, no evidence of tampering was presented which might call into question the validity of the actual ballots counted at the different polling stations. Nor was any evidence of fraud or laxity presented that might have presented clear and convincing evidence of uncertainty, or at least cast doubt, as to the ballots' true security.

There may be specific cases where enough mistakes on the part of the election officials cause uncertainty in the election result. In this case, however, there is no showing that Respondent's statutory non-compliance caused an uncertain election result warranting a new or run-off election, nor any evidence of fraud or tampering on the part of Respondent or his election officials in the handling of the absentee ballots. We may not, therefore, void the ballots, nor invalidate the gubernatorial Election 2000 on the third ground.

## IV. Overage of Voters in Leone

Petitioners claim that the overages and underages amongst the various polling stations cumulatively render the election result uncertain. In particular, Petitioners point to the polling station in Leone that reported an overage of 255 votes. We find this overage, as well as those of other polling stations, to be sufficiently accounted for by the election record despite procedural lapses by election officials that caused the reported overage in the first place.

### A. Leone

An overage of votes occurs when "there are more ballots than the poll book calls for." A.S.C.A. § 6.0802(a). In Leone, there were 255 more ballots than reflected by the number of the voter signatures in the poll book. This large discrepancy is accounted for by the facts.

On November 7, 2000, an election official at the Leone polling station failed to have individual voters sign the poll book. Instead, she crossed out the voters' names with a yellow highlighting pen when they appeared and identified themselves. Voters' names were also openly called out and checked by the partisan poll watchers. Some 247 individuals voted in this manner before the issue was brought to the Leone team leader's attention.

 Electors are mandated to sign the poll book under A.S.C.A. § 6.0706, and ordinarily, the number of "ballots the poll book calls for" is evidenced by the number of signatures in poll book. There is caselaw in some jurisdictions that holds that the statutory requirement of signing a voter registry is directory rather than mandatory, and so the failure of voters to sign a poll book does not render the votes illegal. *See, e.g., Jackson v. Maley*, 806 P.2d 610 (Okla. 1991). We do not choose to rule that highlights may substitute for signatures under our local statutes. Notwithstanding the election official's mistake, no challenges were made to the Leone voters who appeared and voted, partisan poll watchers were able to verify the number and identity of voters on their own lists, and no additional evidence has been presented suggesting that the names of people highlighted on the official roll are other than qualified electors who appeared and voted. Therefore, we find narrowly that in this particular case, the highlighted names account for the 247 missing signatories and alleged overages in Leone.

### B. Reconciling the Reported Overages and Underages

The initial report of 438 overages and underages has been reconciled to the satisfaction of this Court as having been constituted by: (1) the highlighted non-signatures in Leone, (2) an overage due to mistaken

double counting and reporting of Aunu'u/Amouli ballots at the Amouli/Auasi/Utumea polling station, (3) mistake in the counting of signatures on the poll book, and (4) bad math. The total overages and underages, after taking into account all of these factors, is 13 uncertain votes. Such a number does not render the 2000 election result uncertain where the leading candidate's margin above majority is at least 81.

## V. Improper Early Closing of Polls in Manu'a

A.S.C.A. § 6.0701 prescribes the hours that the polls shall remain open on Election Day. The provision states:

> The polls shall be opened by the district officials at 6 a.m. of the Election Day and shall be kept open continuously until 6 p.m. of that day.

The only exception to the dawn 'til dusk open poll period is limited to situations where all of the registered qualified electors of each election district have cast their votes. If all voters have cast their votes, "the polls may be closed earlier." *Id.* Even then, the votes "shall not be counted until after closing time unless allowed by [Respondent]." *Id.*

Notwithstanding this mandate, Respondent allowed the early closing of the polling stations on the islands of Manu'a to accommodate the election officials' return flight schedule. Again, however, Respondent's statutory non-compliance did not render the election result uncertain, where there was evidence that all of the registered voters on the islands of Manu'a had voted, and where there was no showing that the early closing of the polling stations on the Manu'a islands and counting of the votes affected the election result, even though the Tutuila polling station for Manu'a remained open.

When the polls were closed in Manu'a, at at least one polling station, election officials opened and counted the ballots without affording partisan poll watchers the opportunity to physically examine the ballots. This procedural violation, coupled with the premature closing of the polls and the early counting of ballots, invites public suspicion as to the accuracy of the vote count. Although the numbers of the ballots involved do not sufficiently demonstrate any change in the result of the election, public confidence in the process would seem to require a public recount of these ballots in the certification process of the election. We urge, rather than order, Respondent to undertake this course of action in his certification process.

## VI. Failure to Provide List of District Officials

Petitioners claim that Respondent failed to select district officials from a

list of names submitted by each district governor, and also failed to publish the final list of district officials chosen for the 2000 election. Petitioners argue that such oversights are contrary to statutory law, and had the effect of influencing the conduct of the election and of stifling "voters free will."

A.S.C.A. § 6.0402(a) governs the process of selecting district officials. The first part states:

> Each district governor shall submit names for district officials within his district to the chief election officer not later than 4:30 p.m. on the 30th day prior to the close of filing for any election. All officials shall be able to read and write both the Samoan and English languages. If any district governor fails to submit the required names by the above deadline, the chief election officer may fill the positions with available qualified persons.

The statute mandates that the district governors submit a list of district officials a month before the election. The statute also gives the chief election officer the express authority to appoint officials if the governors do not name any persons on time. This authority is extended by § 6.0402(b)(2), which enables the chief election officer to "designate more officials than are needed in order to create a pool of qualified district officials who may be assigned to fill vacancies or to perform those duties as needed in any district in their respective county." Further, § 6.0402(c) bestows the power of appointment upon the chief election officer where vacancies occur due to the "inability, failure, or refusal" of assigned district officials. Statutory law thus contemplates broad latitude for the chief election officer in his task of assigning district officials. The input of district governors is mandatory. Respondent is under legal obligation to solicit a list of names from district governors as per A.S.C.A. § 6.0102, which defines district officials as those "designated by the District Governors."

 Petitioners further claim that Respondent is required by law to publish the list of district officials made pursuant to § 6.0402. None of the statutory provisions cited by Petitioner, however, support this claim. The last sentence of A.S.C.A. § 6.0402 states:

> The chief election officer shall make a list of the district officials by representative district not later than 4:30 p.m. on the 10th day prior to any election.

This provision mandates that a list be made, but not that it be published. Petitioners urge the Court to "give force to the Fono's command," and to give the law a purpose "other than to generate a document." It is not,

31

however, for this Court to expand statutory requirements beyond their plain meaning. The legislature may provide for the publication of this list by statute.

Petitioners further argue that A.S.C.A. § 6.0506 requires Respondent to have made the list of district officials available for public review. The statute states:

> The register of qualified electors and all records appertaining to the registry of qualified electors, or to any election, in the possession of the board of registration, the district officials, or the chief election officer shall, at all reasonable times, be open to the inspection of any qualified elector.

*Id.* Contrary to Petitioners' interpretation of the language of A.S.C.A. § 6.0506, the statute does not mandate that "all records appertaining to . . . the district officials" shall be open to public inspection. The subject of the statute to be made open to the public is plainly and clearly the "register of qualified electors and all records appertaining" thereto. We find that this statutory provision does not require Respondent to make the list of district officials available to the public.

The fact that certain election officials were biased and used coercive means to elicit at least one vote for a particular candidate (though this one vote was later voided and retaken) may indicate that the Election Rule procedures for either choosing or monitoring officials are insufficient. The Court invites the Legislature, author and promulgator of the laws, to address this issue. Such questions of practical policy are not for the Court to decide.

## VII. Unaddressed Challenges to Improper or Unqualified Electors

Petitioners argue that Respondent failed to properly address challenges to electors brought prior to and on Election Day. The procedure and grounds for challenging electors is specifically delineated in A.S.C.A. § 6.0223. Challenges to the qualifications of electors may be brought at three separate times: 1) before the election; 2) on the day of the election; or 3) after the election.

If brought before the election, the challenge must be raised, in writing, by a registered qualified elector to Respondent setting out grounds for disqualifying a registered elector for an election district. A.S.C.A. § 6.0223(a). Respondent must immediately notify the challenged elector, and, as soon as possible, investigate and rule on the challenge. *Id.*

If brought on the day of the election, any qualified elector rightfully in the polling station may challenge the right of any elector to vote. A.S.C.A. § 6.0233(b). Only two challenges may be brought; either: 1) the qualified elector is not the person he alleges himself to be; or 2) the

qualified elector is not entitled to vote in the election district. *Id*. The challenge shall be decided immediately by the district officials, and an appeal may be taken to the board of registration. A.S.C.A. § 6.0223(c).

If brought after the election, the challenge must be brought to the High Court, and the complainant must prove that he or she did not know or could not with due diligence have discovered the alleged grounds for the challenge prior to the elector casting his ballot. A.S.C.A. § 6.0223(d).

## A. Thirty-five Challenges Brought Before the Election Day

 Late in the day prior to the election, Respondent received Petitioners' challenge contesting the qualifications of 35 registered electors. Respondent did not notify challenged voters, investigate or rule on the objection. Instead, Respondent explained in a letter to Petitioners, dated November 13, 2000, that Petitioners had ample opportunity to raise challenges on the day of the election. Petitioners failed to challenge these 35 electors on the day of the election.

The language of the statute clearly requires Respondent to rule "as soon as possible." A.S.C.A. § 6.0233(a). We find Respondent's delay in responding to Petitioners' challenge reasonable given the time pressures of preparing for the general election the following day. Additionally, Petitioners were not prejudiced as they had opportunity to raise the challenges on Election Day, but failed to do so.

## B. Challenges on Election Day

Respondent's rules providing for the handling of Election Day challenges circumvented the district official's decision-making process. The only remedy A.S.A.C. § 3.0710 provides is a direct challenge brought to the Board of Registration. A.S.A.C. § 3.0710 states:

> Where a challenged voter is allowed to vote pursuant to ASCA § 6.0233(c), the following steps shall be taken to safeguard the secrecy of the challenged voter's ballot:
> (a) the challenged voter must present his/her Voter Registration Card, and sign the Official Roll;
> (b) after the challenged voter has voted, each ballot must be placed in an envelope and then sealed. A separate envelope must be provided for each ballot;
> (c) the challenged voter's Voter Registration Number must be written on the top left-hand corner on the front of each envelope;
> (d) the envelope must remain sealed and delivered to the chief election officer;

33

(f) the envelopes will be unsealed and the ballots counted only after the Board of Registration or the High Court has ruled on the challenge.

The Election Rules thus circumvent the statutory right to challenge on Election Day in two ways. First, A.S.A.C. § 3.0710 provides that challenges brought on Election Day shall be sealed and taken to the Board of Registration, rather than being decided immediately. Second, the administrative rule removes the decision-making authority from district officials entirely.

■ Notwithstanding Respondent's statutory non-compliance with Election Day challenge procedure, this mistake did not render the election result uncertain. Electors lawfully at the polls on Election Day were permitted to challenge, and did, in fact, wage at least 22 challenges. Even if these challenges were treated in the light most favorable to Petitioners, and added to the overall election result as if they were votes for Petitioners, the election result would not be rendered uncertain.

## VIII. Wrongful Acts and Election Fraud Generally

■ Petitioner claims that the general effect of the statutory violations, wrongful acts and "widespread irregularities in the entire voting system" makes the election uncertain. (Pet'r's Tr. Br.) According to statute, we may rule that the cumulative effect of any number of claims can change an election result even if any of the individual claims is incapable of doing so on its own. Again, we look to the standard of review set forth in A.S.C.A. § 6.0903(c).

It is possible for fraud to be so rampant, and corruption so widespread, that the "correct result" is impossible to ascertain. Certainly, Petitioners have demonstrated that a number of irregularities and contraventions of the law occurred in the conduct of this election: at some polls, campaign members with political logos on their shirts sat in election officials' chairs for many minutes at a time, campaign leaders greeted voters and shook hands outside of polling stations, and partisan camps entered polling stations to bring food to various election officials. However, Petitioners have failed to specifically, clearly, and convincingly demonstrate that these activities affected the vote. They may argue that the campaigning influenced the air, created a mood, or was annoying, but according to the standard of review set by the laws of American Samoa, this is not enough. Even considering all evidence in the light most favorable to Petitioners, we cannot find the election result uncertain.

## Order

For the foregoing reasons, Petitioners' complaint is dismissed. Judgment shall enter accordingly.

It is so ordered.